**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| Jeremy Adkins | : | |
| | : | |
| vs. | : | Civil Action No. 21-1847 |
| | : | |
| H&K Group, Inc.; Haines and Kibblehouse, | : | |
| Inc. and Reading Materials, Inc. | : | JURY TRIAL DEMANDED |

### JOINT REPORT OF RULE 26(f) MEETING AND PROPOSED DISCOVERY PLAN

In accordance with Federal Rule of Civil Procedure 26(f), counsel for the parties conferred on July 21, 2021, and submit the following report of their meeting for the Court's consideration:

**I.** **Discussion of Claims, Defenses, and Relevant Issues**

    **A. Plaintiff's Summary of the Case:**

Plaintiff initiated this action against Defendants, his former employers, for violations of the Americans with Disabilities Act ("ADA" – 42 U.S.C. §§ 12101, *et. seq*.), The Family and Medical Leave Act, the Pennsylvania Medical Marijuana Act ("MMA" - 35 P.S. §§ 10231.101, *et seq*), the Fair Labor Standards Act ("FLSA" - 29 U.S.C. §§ 201, *et. seq*.), and the Pennsylvania Minimum Wage Act ("PMWA" – 43 P. S. §§ 333.101 *et. seq*.). In short, Plaintiff was not paid overtime compensation and then terminated from his employment due to his actual or perceived disabilities, his use of and requests for accommodations, and his medical marijuana prescription.

Plaintiff was hired by Defendants effective on or about April 20, 2005. Plaintiff is a 51-year-old man, who was employed at all relevant times herein as working foreman for Defendants.[1]
In total, Plaintiff was employed with Defendants for approximately 15.5 years until being terminated.

Defendants, companywide, pay their employees labeled "foremen" illegally. Plaintiff was paid a set salary for all hours worked, ***regardless of*** whether he worked substantially more than 40 hours in

---

[1] Plaintiff worked as a foreman for his last approximate 5 years of employment.

a typical workweek. More specifically, Plaintiff was paid $1,420.00 gross per week (or an approximate salary of $73,840.00 per year). Plaintiff generally averaged <u>at least</u> 60 hours (or more) of actual work and labor in a workweek during most workweeks during his period of employment as it wouldn't be uncommon for him to work 7-14 days straight without any days off from work (at 10-15 hour-work days).

Defendant is a construction company providing a wide variety of construction services. However, Plaintiff's role focused primarily within Defendants' paving division / branch. Salary is not indicative of a potential exemption from overtime; but rather, an employee's "primary duties" dictate whether such employee must be paid overtime compensation. Plaintiff's primary duties included the following: **1)** From in or about December to March of each season, actual paving operations were slower (constructive driven by season). Thus, Plaintiff physically worked in Defendants' shop. During this timeframe, Plaintiff: i) Worked in a garage with 3 bays; ii) Spent the winter physically upgrading, repairing, and maintaining Pavers for the coming year(s); iii) Continually performed manual repairs, jacked up or elevated Pavers, engaged in drilling, taking oil samples, replacing parts on Pavers, and other general repair; and iv) Assisting with salting, shoveling, and snow removal during and following snow storms within Defendant's premises and other locations. **2)** From in or about April to November of each season, Plaintiff was a general laborer although referred to as a "foreman." During this timeframe, Plaintiff: i) Would appear at locations where paving was taking place (but he was not a Paver Operator, nor did he drive such machinery); ii) Would spend approximately 30-60 minutes throughout the day recording the amount of time workers spent on specific tasks throughout the day; and iii) Would spend the rest of his typical workday raking, shoveling, measuring, spreading blacktop, and answering questions throughout the day from Defendants about the job status.

Throughout each full year, 99% of Plaintiff's job and "primary duties" was literally making physical repairs, performing manual labor, and working alongside other construction members. The term "foreman" was generally attributed to Plaintiff as a point of contact for Defendants, *as opposed*

2

*to* indicate he was in any manner a high-level of management. In fact, Plaintiff was directly supervised by a Superintendent who made any meaningful decisions. Plaintiff **DID NOT**: 1) Have any type of designated office space in any workplace or facility and merely filled out any paperwork <u>in a truck</u> when time permitted (as he did not perform any typical white-collar duties); 2) Have any authority to hire or terminate employees, as any such decisions were made by actual management (nor did he engage in any such activities); 3) Have any authority to evaluate or give additional compensation to any employees, as any such decisions were made by actual management (nor did he engage in an such activities); or 4) Have any participation in management policy making or management business meetings, as Plaintiff was merely a laborer and worker (not someone who was considered for input from a corporate or management perspective). Plaintiff's "primary duties" were labor, not management. This is simply indefensible, as Plaintiff could not have fallen into the "executive" exemption under the FLSA. *See* 29 C.F.R. 541.100[2]

While Plaintiff was paid a qualifying salary (an easy threshold), he <u>never</u> performed "primary duties" of executive management. Although at times referred to at times as a "foreman" Plaintiff **did not**: 1) Hire anyone; 2) Discipline anyone; 3) Evaluate anyone; 4) Terminate anyone; 5) Give pay increases or compensation; 6) Create, draft, or prepare company policies; or 7) Approve or disapprove of requested vacation, PTO, or any other time off. The undeniable reality is Defendants called Plaintiff a "foreman" and paid him a salary to knowingly exploit him because unfortunately the majority of blue-collar workers (and laborers) have the common misunderstanding or misperception that if they are paid a salary, they must not be entitled to overtime pay. The primary duties of Plaintiff's job entailed him providing manual labor.

---

[2] To avoid redundancy and to limit Plaintiff's statement of facts, he refrains from outlining the legal authority supporting his position, however, the same is outlined in detail in his complaint.

Not only did Defendants fail to properly pay Plaintiff overtime, but they also wrongfully terminated him. On or about April 6, 2020, Plaintiff suffered a stroke and numerous related complications. Plaintiff resumed working for Defendants in or about mid-May of 2020 for about a month, until in or about mid-June of 2020.[3] Plaintiff took a medical leave of absence from in or about mid-June of 2020 through early November of 2020. This was due to stroke and other health problems. Plaintiff was assured his job would remain open by Defendants' management, and Plaintiff was encouraged to get better from the summer through fall of 2020.

Plaintiff attempted to return to work in early November of 2020. Defendants refused to let Plaintiff return to work claiming they could not provide Plaintiff with accommodations such as lesser work hours (although Plaintiff's request(s) were temporary and reasonable). Plaintiff was however *again assured* he could commence working when able to work without medical restrictions by Defendants' management. Defendants' management confirmed Plaintiff could resume working in mid-December of 2020, as Plaintiff provided new medical information showing he only needed a maximum-hour, per-day limitation *for 1 month* and then was permitted to resume working <u>without</u> any medical restrictions. Specifically, Plaintiff's return to work note stated:

> [Plaintiff] has current been under our care. From our standpoint, he may return to work on 12/21/2020 starting at an 8-hour work day for 1 month with a 50 lb weight restriction. Following this month, he may then return to his regular schedule without any restrictions on hours per day as well as a weight restriction.

It was initially expected and planned that Plaintiff would resume working per his above-referenced medical clearance by Defendants. In conjunction with Plaintiff's discussions about returning to work, Plaintiff discussed the status of his health problems, his treatment, and that he was being approved for a medical marijuana card. Plaintiff merely wanted to be completely transparent with Defendants.

---

[3] Plaintiff did not initially use a medical leave upon suffering the stroke, as Defendants' operations were temporarily closed due to the COVID-19 pandemic.

Defendants' management referred to Plaintiff as a "liability," and informed him numerous times in December of 2020 that in order for him to be allowed to resume work, he needs to "provide a letter that [he is] no longer using marijuana to treat [for his] health issue." This was both verbal and in writing.

Plaintiff expressed concerns of discriminatory treatment to Defendants' management, questioned why they would dictate his medical regimen, and was then suddenly told - - it doesn't matter because he is instead being laid off. Following Plaintiff's expected return to work on December 21, 2020, Plaintiff was never permitted to resume working, was terminated, and never called back for work (despite being initially told his layoff may only be temporary).  Plaintiff was assured his job was being held open, coordinated to return to work, expected to return to work – and then solely because he discussed his health issues and expressed concerns of discrimination – he was abruptly "laid off."

Defendant has continued to hire employees, to permit all other laborers to work, and Plaintiff was <u>the only</u> foreman of Defendants allegedly affected by a pretextual layoff. Plaintiff was discriminated against, retaliated against, and not medically accommodated.

### B.  Defendants' Summary of the Case:

Defendants deny that Plaintiff is entitled to overtime pay pursuant to the Fair Labor Standards Act and the Pennsylvania Minimum Wage Act.  During the time period relevant to Plaintiff's claims, Plaintiff was employed as a paving foreman for the H&K Group, Inc. d/b/a Pikes Creek Site Contractors.  Plaintiff's position was properly classified as "exempt" from overtime obligations pursuant to the Fair Labor Standards Act and the Pennsylvania Minimum Wage Act based upon the primary duties of his position and the fact that he was paid a weekly salary in excess of $684 per week (which he received even in weeks when he worked less than forty (40) hours in a workweek).

As a paving foreman, Plaintiff was paid a weekly salary of $1,420, supervised a team of 6-9 individuals on a paving crew, and when necessary evaluated and corrected individuals who he supervised at the job site.  Plaintiff was also included in and provided feedback in discussions with

5

supervisors about problems or concerns related to employees on his paving crew.  In addition, Plaintiff recorded the time/work performed by the individuals who he supervised, managed equipment/staffing needed during the project, managed the temperature and slope of the paving operations performed by subordinates, and addressed discussions and inquiries with customers and inspectors on the job site as the projects proceeded.  Following the close of the paving season each year (at which time employees, including laborers and paving operators were subject to seasonal lay-off due to lack of work), Plaintiff's job responsibilities continued, as needed, to ready paving equipment for the upcoming season, and to assist in other duties, as assigned.

Plaintiff suffered a stroke on April 6, 2020; the company afforded him FMLA leave/medical leave of absence and short-term disability benefits, as needed, during the course of his medical recovery.  Plaintiff utilized all 12-weeks of FMLA leave and fully exhausted his FMLA leave as of September 8, 2020.  Since Plaintiff was unable to return to work to do the essential functions of his job position at that time in September 2020, the company continued to provide Plaintiff with a medical leave of absence/short-term disability benefits while he continued to recover.  Plaintiff's medical recovery continued into and past the company's normal seasonal lay-off period in November 2020, which due to COVID-related slowdowns, extended to more of the company's employees at the end of 2020.  Plaintiff received the maximum benefits possible pursuant to the company's short-term disability benefits, for whom those benefits ended on December 21, 2020.

As to Plaintiff's claims that his employment was terminated in retaliation for taking FMLA leave, discrimination/retaliation or failure to provide a reasonable accommodation pursuant to the ADA, or due to his medical marijuana prescription, Defendants, likewise, deny all claims.  First, Plaintiff cannot establish the causal connection necessary between his alleged termination and the FMLA leave that he received.  Second, the company provided Plaintiff with a reasonable accommodation of continued medical leave.  And third, Plaintiff never submitted or produced a certified medical marijuana ID card to the company during his employment or requested any

accommodation related to his use of medical marijuana.  Furthermore, use of medical marijuana does not, in and of itself, qualify as a "disability," nor is an employer required to accommodate medical marijuana use or an employee "under the influence" of medical marijuana in the workplace, particularly when the employee is employed in a safety-sensitive job position, which requires working on or around motor vehicles, heavy construction machinery, and hot materials/asphalt and supervising employees who work on or around the same.

## II. Informal Disclosures

The parties have served their initial disclosures and written discovery in accordance with the Federal Rules of Civil Procedure.

## III. Formal Discovery

The parties do not anticipate the need to have discovery conducted in phases or limited to particular issues.  The parties anticipate conducting written discovery in accordance with the Federal Rules of Civil Procedure.  The parties anticipate taking no more than the number of depositions set forth in the Federal Rules of Civil Procedure.  The parties propose the following deadlines:

1. All fact discovery shall be completed by November 22, 2021;

2. Expert discovery, if any, shall be completed by February 2, 2022.

3. Any motions for summary judgment, and *Daubert* motions, shall be filed on or before February 21, 2022; response(s) to any such motions shall be filed on or before March 14, 2022.

4. All further deadlines shall be set pending the outcome of dispositive motions.

## IV. Electronic Discovery

The parties are not aware of any issues regarding the disclosure of discovery of electronically stored information.  It is not anticipated at this time that there will be any issues requiring the Court's attention with respect to disclosure of discovery of electronically stored information.  Counsel anticipate that they will be able to work together with respect to electronic discovery issues.

## V. Expert Witness Disclosures

To the extent experts are necessary for liability or damages, Plaintiff will identify and submit curriculum vitae for all expert witnesses and will serve Defendants with reports and/or responses to expert witnesses on liability and damages on or before December 15, 2021.  On or before January 12, 2022, Defendants will identify and submit curriculum vitae for all expert witnesses on liability and damages and will serve Plaintiff with reports and/or responses to expert witnesses on liability and damages.  All expert discovery shall be completed by February 2, 2022.

**VI.**   **Early Settlement or Resolution**

If the parties believe that a Settlement Conference will be productive, they will jointly request a referral for a Settlement Conference.

**VII.**   **Trial**

Defendants anticipate filing motions for summary judgment in accordance with the Court's Scheduling Order.  As a result, the parties respectfully request that a trial certain date be issued at least forty-five (45) days after disposition of Defendants' motions for summary judgment.  This would prevent the parties from having to incur unnecessary costs of preparing pretrial submissions on issues that may ultimately be resolved at summary judgment.  If the case proceeds to trial, it is estimated that Plaintiff will need 2-3 days to present his case and Defendants will need 2-3 days to present its case, for a total trial time of approximately 4-6 days.

**VIII.**   **Other Matters**

The parties do not believe that any other orders need be issued under Rule 26(c) or under Rule 16(b) or (c) at this time.

| | |
|---|---|
| **KARPF, KARPF & CERUTTI, P.C.** | **MARSHALL DENNEHEY WARNER COLEMAN & GOGGIN** |
| BY:___/s/ Timothy S. Seiler_____ | BY:___/s/ John L. Lamb_____ |
|     TIMOTHY S. SEILER |     RONDA K. O'DONNELL |
|     Attorney ID No. 316913 |     Attorney ID No. 47603 |
|     ANDREW OLCESE |     JOHN L. LAMB |
|     Attorney ID No. 324732 |     Attorney ID No. 324291 |
|     Two Greenwood Square |     2000 Market Street, Suite 2300 |

3331 Street Road, Suite 128           Philadelphia, PA  19103
Bensalem, PA  19020                  P: (215) 575-2697/2658
P: (215) 639-0801                    F: (215) 575-0856
F: (215) 639-4970                   E-mail:  rkodonnell@mdwcg.com/
E-mail: tseiler@karpf-law.com/     jllamb@mdwcg.com
aolcese@karpf-law.com


Attorneys for Plaintiff               Attorneys for Defendants


Dated: August 12, 2021